UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: : Chapter 11
:
VERTIS HOLDINGS, INC., *et al.*, : Case No. 10-_____ ( )
:
Debtors. : (Motion for Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF GERALD SOKOL, JR. PURSUANT TO
S.D.N.Y. LBR 1007-2 IN SUPPORT OF THE DEBTORS' CHAPTER 11
PETITIONS AND FIRST-DAY MOTIONS**

I, Gerald Sokol, Jr., being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Financial Officer of Vertis, Inc. ("Vertis" and collectively with the other debtors-in-possession in the above captioned cases, the "Debtors")[1]. I was named to that position in December 2009. Prior to that, I was with America Online, LLC, a subsidiary of Time Warner, Inc., where I served as Executive Vice President of AOL Access Finance, Operations & Strategy from 2004 to 2009. From 1999 to 2004, I held other key positions at America OnLine, LLC, including Executive Vice President, AOL International, Finance & Operations; Senior Vice President, AOL International, Finance & Operations and Vice President of International Finance.

2. I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York (the "Local Rules") to (i) assist the Bankruptcy Court of the Southern District of New York (the "Court," and the

---

[1] The Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number, are Vertis Holdings, Inc. (1556); Vertis, Inc. (8322); ACG Holdings, Inc. (5968); Webcraft, LLC (6725); American Color Graphics, Inc. (3976); and Webcraft Chemicals, LLC (6726).

Southern District of New York hereinafter referred to as the "District") and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases, and (ii) in support of (a) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"), and (b) the relief, in the form of motions and other applications, that the Debtors have requested of the Court (the "First-Day Motions"). I am authorized by each of the Debtors to submit this Declaration in support of the Debtors' chapter 11 petitions and the First-Day Motions.

3. In my capacity as the Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by the Debtors' personnel in departments within the various business units of the Debtors; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team and the Debtors' advisors; or my opinion based upon experience, expertise and knowledge of the Debtors' operations and financial condition. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees and advisors, I have relied upon these employees and advisors accurately recording, preparing, collecting or verifying any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**I.     Overview of the Debtors' Business**

4.      Vertis is a leading provider of marketing communications services and one of the largest offset printers in North America, offering insert advertising, direct mail production and distribution, and related services to its clients. Vertis' experience in the planning, design, production, distribution and measurement of effective advertising messages allows its clients to maximize their return on marketing dollar spent by outsourcing their marketing communications functions to Vertis. By offering an extensive list of solutions distributed across a broad spectrum of media, Vertis enables its clients to reach customers with the most effective message. Customers employ these services individually or on a combined basis to create targeted marketing solutions.

5.      Vertis works with over 1,900 clients, many of which are large and well-known Fortune 1000 companies, including American Express, Kroger, Macy's, and Mutual of Omaha. The company has strategically targeted certain industries, such as grocery store chains and drug stores, that provide a level of insulation to economic cycles. Vertis operates primarily through two reportable business segments: advertising inserts ("Advertising Inserts") and direct marketing ("Direct Marketing"). In addition, Vertis provides outsourced digital premedia and image content management, creative services for advertising insert page layout and design, and media planning and placement services (collectively, "Integrated Media Solutions").

6.      The Advertising Inserts segment, which is Vertis' largest business line, offers offset print advertising, including advertising inserts, newspaper specialty sections such as television program guides and comics, and print products delivered through magazines, newspapers and other publications. Vertis is one of the leading providers of advertising inserts, newspaper television listing guides and Sunday comics in the United States. In 2009, Vertis

produced more than 35 billion advertising inserts and 1.4 billion Sunday comics, approximately 900 million television program guides, and provided services to approximately two-thirds of the top 100 Sunday newspapers in the United States. In 2009, the Advertising Inserts segment generated revenue and adjusted EBITDA of $949.7 million and $137.0 million, respectively, which accounted for approximately 71.7% of Vertis' total revenue and 84.4% of its adjusted EBITDA for 2009.

7. Direct Marketing offers highly customized direct mail, one-to-one marketing programs, and mailing management products and services in the United States. Vertis utilizes sophisticated, data-driven techniques to help companies target their customers based on a variety of attributes, including demographics, purchase transactions and consumer preferences. The individualized marketing programs and web-based workflow tools enable effective implementation of highly variable programs across multiple channels, such as mail, email, personal websites and mobile devices. For the year ended December 31, 2009, the Direct Marketing segment generated revenue and adjusted EBITDA of $280.0 million and $22.3 million, respectively, which accounted for approximately 21.1% of Vertis' total revenue and 13.7% of its adjusted EBITDA for 2009.

8. Integrated Media Solutions includes premedia services, consumer research, creative services such as consumer product packaging design and development, graphic design and animation, digital photography and digital content management, workflow applications, media planning and placement, interactive agency services, and email management. The offerings of Integrated Media Solutions support the targeting and production efficiency needs required by Advertising Inserts and Direct Marketing clients. For the year ended December 31, 2009, the Integrated Media Solutions Segment generated revenue and adjusted EBITDA of $94.1

million and $12.1 million, respectively, which accounted for the remainder of Vertis' total revenue and adjusted EBITDA for 2009.

## II. Corporate Organization and Capital Structure

9. The Debtors' operations are conducted through eight entities, six of which are subject to these chapter 11 proceedings, and two of which are not. Vertis, Inc., the entity through which the substantial majority of the Debtors' operations are carried out, is a wholly-owned operating subsidiary of Vertis Holdings, Inc. Vertis Holdings, Inc. is the ultimate parent company of the corporate family. It has no assets and does not conduct any operations other than with respect to its ownership of Vertis, Inc. Vertis, Inc. in turn is the direct or indirect parent company of each of the other Debtors (collectively, the "Subsidiary Debtors"). The two non-debtor subsidiaries are Laser Tech Color Mexico S.A. de C.V. and Vertis Digital Services Ltd. (UK), neither of which conducts any business. A corporate organization chart of the Company is attached as Exhibit A.

10. Each of the Debtors is incorporated or organized in Delaware, with the exception of American Color Graphics, Inc., which is incorporated in New York. Vertis' principal executive offices are located at 250 West Pratt Street, Baltimore, Maryland 21201. As of November 1, 2010, the Company had approximately 5,225 employees across North America. For the year ended December 31, 2009, the Debtors' had total revenue of approximately $1.32 billion. As of October 31, 2010, the Company's unaudited consolidated financial statements reflected assets of approximately $1.49 billion and liabilities of approximately $1.56 billion.

11. The Debtors are party to a $250 million senior secured revolving credit agreement (the "Prepetition Revolving Credit Facility") with General Electric Capital Corporation, as agent, and certain other lenders party thereto and a $397.5 million term loan

5

credit agreement (the "Prepetition Term Loan Facility", and together with the Prepetition Revolving Credit Facility, the "Prepetition Facilities") with Ableco Finance LLC, as agent, and certain other lenders party thereto. The Prepetition Revolving Credit Facility is secured by a lien on substantially all of Vertis' assets and the assets of the guarantors, with a first priority lien on current assets and a second priority lien on fixed assets and intellectual property. As of November 17, 2010, Vertis had drawn approximately $115.4 million under the Prepetition Revolving Credit Facility.

12. The Prepetition Term Loan Facility also is secured by a lien on substantially all of Vertis' assets and the assets of the guarantors, with a first priority lien on fixed assets and intellectual property and a second priority lien on current assets. As of November 17, 2010 there was approximately $428.6 million outstanding under the Prepetition Term Loan Facility.

13. On October 17, 2008, Vertis issued those certain Senior Secured Second Lien Notes due 2012 pursuant to an indenture with Wilmington Trust Company, as trustee (the "Second Lien Notes"). The Second Lien Notes are guaranteed by the Subsidiary Debtors. Approximately $294 million of the Second Lien Notes were issued as Series A Notes and approximately $56 million were issued as Series B Notes. The Second Lien Notes indenture also provides for Series C Notes, representing payment-in-kind interest paid on the Series B Notes. The current outstanding balances of the Series A Notes, Series B Notes and Series C Notes are approximately $415.8 million, $56 million, and $23.3 million, respectively. Vertis' obligations under the Second Lien Notes are secured by a third priority lien on substantially all of Vertis' assets and the assets of the Subsidiary Debtors.

14. On October 17, 2008, Vertis also issued those certain Senior Pay-in-Kind Notes due 2014 (the "Senior PIK Notes") pursuant to an indenture with HSBC Bank USA, National Association, as trustee, under which Vertis issued $200 million in aggregate principal amount of the Senior PIK Notes. The Senior PIK Notes are unsecured, but are guaranteed by the Subsidiary Debtors. The current outstanding balance of the Senior PIK Notes is approximately $258.4 million.

15. Vertis Holdings, Inc., the ultimate parent company, is a private company. As of the Petition Date, there were approximately forty (40) holders of Vertis Holdings, Inc.'s common stock. Its largest stockholders are affiliates of Avenue Capital Management, who collectively own 59.2% of the company's outstanding stock, and who have appointed three of the company's five board members. Avenue also holds significant amounts of the Debtors' debt obligations. More specifically, Avenue owns (a) $119.7 million of the Prepetition Term Loan Facility, (b) all of the Series B Notes and the Series C Notes, for a total of approximately $79.3 million, or 16%, of the Second Lien Notes, and (c) $146.5 million, or 56.7%, of the Senior PIK Notes.

### III. Events Leading to the Chapter 11 Cases

16. This is not the Debtors' first journey through chapter 11. On July 15, 2008, Vertis and certain of its direct and indirect subsidiaries commenced prepackaged chapter 11 cases in the United States Bankruptcy Court for the District of Delaware. On that same date, ACG Holdings, Inc. ("ACG") and certain of its direct and indirect subsidiaries likewise commenced related prepackaged chapter 11 cases. Vertis (and its subsidiaries) and ACG (and its subsidiaries) consummated a prepackaged plan of reorganization which merged Vertis and the ACG entities. The Debtors in these chapter 11 cases are those merged corporate entities.

17. Vertis' 2008 bankruptcy filing was precipitated by its highly leveraged capital structure and the maturity of its then-outstanding credit agreements. Despite Vertis' successful merger with ACG and the consummation of the 2008 prepackaged plan, the company emerged from chapter 11 in late 2008 under the cloud caused by the capital markets turmoil that culminated in the collapse of Lehman Brothers on September 15, 2008. These events undermined the success of the 2008 reorganization plan, resulting in the company still being highly leveraged. Accordingly, when the Debtors emerged from bankruptcy in the fall of 2008, they knew they would need to undertake additional de-leveraging transactions.

18. The Debtors initially considered doing so in the fall of 2009, but determined that the capital markets would not be receptive to a significant restructuring initiative at that time. However, beginning in very late 2009 and into the spring of 2010, the Debtors attempted a comprehensive restructuring of their balance sheet. During this time, the company attempted to obtain a new revolving lending facility and a new term loan facility (collectively, the "New Loan Facilities") to refinance their obligations under the Pre-Petition Facilities. In conjunction with these efforts, the Debtors also sought to restructure the Second Lien Notes and the Senior PIK Notes by converting them to combinations of new debt, preferred stock, and common equity.

19. On April 15, 2010, the Debtors launched exchange offers and related consent solicitations wherein they offered to restructure the Second Lien Notes and the Senior PIK Notes, in each case contingent upon consummation of New Loan Facilities. However, the capital markets were skeptical of the proposed terms and, as a consequence, the Debtors were not able to obtain sufficient levels of participation in the exchange offers or New Loan Facilities on terms acceptable to them. The Debtors continued to work with their stakeholders, however,

including Avenue, their largest stakeholder, in an effort to refine the terms of their offering. Ultimately, the Debtors significantly modified the terms of their offering on several subsequent occasions, issuing supplemental exchange offer materials on each of April 26, 2010, May 7, 2010, July 27, 2010, August 13, 2010, and August 18, 2010.

20. In late August 2010, the Debtors and their stakeholders concluded that they still had not received sufficient participation in the exchange offers to warrant consummating them. Moreover, as of that time, the Debtors had been unable to obtain commitments, at acceptable rates, for the term loan component of the New Loan Facilities sufficient to refinance the Prepetition Facilities. This was because of perceptions in the loan markets that the modified exchange offers still left the Debtors too highly leveraged. As a result, the Debtors concluded that they needed to significantly alter their strategy, including by proposing more significant debt reductions in the exchange offers.

21. Accordingly, beginning on Labor Day weekend, the Debtors began marshalling their advisors and working with renewed intensity on a comprehensive restructuring with the aim of consummating a transaction, either in-court or out-of-court, by year end. The need to conclude the restructuring during this window is critical. The Debtors have faced continuing uncertainty about their capital structure since their emergence from chapter 11 in the fall of 2008, uncertainty that has been exasperated by the Debtors' multiple, unsuccessful efforts since the spring of 2010 to consummate exchange offers relating to their Second Lien Notes and Senior PIK Notes and to obtain new lending facilities to refinance the Existing Facilities.

22. It is especially important for the Debtors to put these matters behind them before the first quarter of 2011. The first quarter is a critical period in the printing industry because it marks the beginning of the selling season and sets the benchmark for the Debtors'

financial results for the year. The Debtors must be able to demonstrate to their clients, vendors, suppliers and employees that they have resolved their balance sheet issues, once and for all, before the first quarter commences. If the Debtors have not emerged from bankruptcy, the competition may try to use this against them, causing a loss in first quarter sales, which may debilitate the Debtors' prospects for a successful reorganization.

## IV. Overview of the Key Elements of The Debtors' Restructuring Plan

23. There are three central components to the Debtors' comprehensive restructuring. First, the Debtors propose to convert all of the Second Lien Notes and all of the Senior PIK Notes into equity in the reorganized enterprise. If successful, this will result in the elimination of over $700 million of debt from the Debtors' balance sheet – a reduction of approximately 60% -- and place the Debtors' restructured balance sheet more in line with the capital structures of their most significant competitors. This represents a significant additional reduction of debt compared to the reductions contemplated by the Debtors' previous, unsuccessful exchange offers, and will materially enhance the Debtors' position in the marketplace.

24. Second, the Debtors have offered to holders of the Second Lien Notes the opportunity to purchase up to $100 million in new common stock of the restructured enterprise (the "Private Placement").[2] The Debtors obtained commitments, pursuant to a signed Equity Commitment Agreement, from significant holders of their Second Lien Notes to purchase their pro rata share of the new equity. In addition, Avenue and several other holders of Second Lien Notes (the "Backstop Investors") have agreed to purchase any new equity not purchased by other

---

[2] This amount may be reduced by up to $20 million if, in the judgment of the Debtors' existing board, they determine that the Debtors do not need the full $100 million upon emergence.

10

holders of the Notes, thereby ensuring that the Debtors will receive the full amount of the Private Placement.³ The proceeds of the offering will be used, in part, to pay the outstanding balances under the Prepetition Facilities and for general working capital purposes.

25. Third, the Debtors obtained two commitments for new exit loan facilities, the proceeds of which will refinance the Existing Facilities. These commitments include a commitment for a new, senior secured exit revolving credit facility of up to $175 million (the "Exit Revolving Credit Facility"), with General Electric Capital Corporation ("GE Capital") as administrative agent. The proceeds of the Exit Revolving Credit Facility will pay off borrowings under a $200 million debtor-in-possession lending facility that GE Capital and Golden Gate Capital have agreed, by separate agreement, to provide (the "DIP Revolving Credit Facility"). The Debtors also received a commitment for a new senior secured first lien term loan of up to $425 million from Morgan Stanley Senior Funding, Inc. (the "Exit Term Loan" and, together with the Exit Revolving Credit Facility, the "Exit Credit Facilities"). Avenue has agreed to fund up to $80 million of the new Exit Term Loan on the terms and conditions set forth in that certain commitment agreement entered into as of November 1, 2010 by and between Avenue and the Debtors.

26. The Debtors obtained overwhelming support for the foregoing restructuring from their largest stakeholders prior to the formal solicitation of votes. In particular, twenty-two (22) separate holders of Second Lien Notes and holders of Senior PIK Notes entered into a restructuring support agreement with the Debtors (the "Restructuring Support Agreement") pursuant to which they agreed to support the restructuring, whether implemented pursuant to an

---

³ The Backstop Investors include twenty (20) holders of Second Lien Notes that collectively own approximately $388.0 million (78.4%) of the Second Lien Notes. In exchange for the Backstop Investors' commitment, the Debtors have agreed to pay the Backstop Investors an aggregate fee equal to 10% of the new common stock after giving effect to the issuance and sale of all shares contemplated by the Plan (the "Backstop Fee").

out-of-court exchange offer, a pre-packaged reorganization plan, or a pre-negotiated reorganization plan. Those holders collectively hold approximately $394.7 million (79.7%) in aggregate principal amount of the outstanding Second Lien Notes, and $175.3 million (67.9%) aggregate principal amount of the outstanding Senior PIK Notes.

**V.    The Pre-Petition Exchange Offer and Solicitation
Of Votes on the Prepackaged Plan of Reorganization**

27.     On November 1, 2010, the Debtors formally commenced soliciting votes on their restructuring plan. They did so pursuant to their Amended Confidential Offering Memorandum, Consent Solicitation, Private Placement and Disclosure Statement Soliciting Acceptances Of A Prepackaged Plan Of Reorganization (the "<u>Offering Memorandum and Disclosure Statement</u>"). Pursuant to the Offering Memorandum and Disclosure Statement, holders of the Second Lien Notes were offered the right to exchange their Notes for approximately 96.25% of the new equity in restructured Vertis Holdings, Inc., and holders of the PIK Notes were offered the right to exchange their Notes for the balance of the new equity.

28.     The proposed percentage of new common stock allocated to holders of the Second Lien Notes is subject to dilution on account of the $100 million Private Placement referred to above; the new common stock payable to the Backstop Parties on account of the Backstop Fee; and a management incentive plan, to be developed by the new board, that contemplates 10% of such stock on a fully diluted basis being available for management compensation. The deadline for the exchange (and voting on the prepackaged plan, described below) is December 1, 2010. However, the Debtors offered an incentive for holders of the Notes to tender early: holders of Second Lien Notes who tendered by November 15, 2010 would receive a cash payment equal to 25 basis points (.0025%) of their holdings, whereas holders of

Senior PIK Notes would receive up to 5% (as opposed to 3.75%) of the new equity, conditioned in each case upon consummation of the out-of-court exchange offers.

29. The Offering Memorandum and Disclosure Statement provide that a condition to consummation of the exchange offers is that at least 98% of the Second Lien Notes and at least 98% of the Senior PIK Notes are tendered. It further notified holders that their tenders would constitute votes on the Debtors' Joint Prepackaged Chapter 11 Plan Of Vertis Holdings, Inc., et al. (the "Plan"), a copy of which was included with the Offering Memorandum and Disclosure Statement. The solicitation materials provided that if the Debtors did not receive the requisite participation in the out-of-court exchange offers, they would commence chapter 11 proceedings and pursue confirmation of the Plan. Indeed, the Debtors reserved the right to commence chapter 11 cases immediately after the November 15, 2010, early tender deadline. The proposed distributions to holders of Second Lien Notes and Senior PIK Notes under the Plan are essentially the same as under the out-of-court exchange offers, except that under the Plan, no holder will be entitled to the early consent consideration.

30. Voting results as of the early consent time indicate that there is a low likelihood of reaching the 98% participation levels established in the out-of court exchange offers. Accordingly, the Debtors determined to commence these cases prior to the December 1, 2010, voting deadline in order to expedite their restructuring. However, it is clear from the voting results thus far that holders of the Notes have voted overwhelmingly to accept the Plan. Specifically, holders of approximately $428,182,596 in aggregate amount of the Second Lien Notes have voted on the Plan, which comprises 86.4% of the aggregate principal amount of Second Lien Notes outstanding as of the Petition Date. Of those who have voted, 98.29% in aggregate principal amount of the Series A Second Lien Notes have voted to accept the Plan and

100% in aggregate principal amount of the Series B and Series C Second Lien Notes have voted to accept the Plan. Holders of approximately $218 million in aggregate principal amount of the Senior PIK Notes have voted on the Plan, which comprises 84.2% of the aggregate principal amount of Senior PIK Notes outstanding as of the Petition Date. Of those who have voted, 99.98% in aggregate principal amount of the Senior PIK Notes have voted to accept the Plan.

31. A chart summarizing the results of voting thus far is attached hereto as Exhibit L. As soon as reasonably practicable after the voting deadline passes, the Debtors will file a declaration of the voting agent certifying the results and methodology for tabulation of ballots accepting or rejecting the Plan.

## VI. Overview of the Terms of, and Recoveries Under, the Prepackaged Plan of Reorganization

32. The Plan contains eleven classes of claims and interests. The holders of claims in four of those classes are impaired under the Plan, will receive a recovery, and therefore, are entitled to vote on the Plan. Three of those classes relate to the Second Lien Notes. As noted above, the Second Lien Notes were issued in three series: Series A, Series B, and Series C. Claims on account of such Notes are classified in classes 4A, 4B, and 4C, respectively, under the Plan. The fourth class relates to the Debtors' Senior PIK Notes, which are classified in class 6 under the Plan.

33. The remaining classes are either (a) unimpaired under the Plan and therefore, are deemed to accept such Plan, or (b) are impaired under the Plan and will receive no recovery, and therefore, are deemed to reject such Plan. In particular, old equity interests in Vertis Holdings and holders of any claims asserting damages or a right of rescission on account of old equity interests in Vertis Holdings will receive no recovery under the plan. However, administrative claims and all general unsecured claims will be paid in full in cash in the ordinary

course.[4] The Existing Facilities and the DIP Revolving Credit Facility will be repaid in full in cash with proceeds from the Exit Credit Facilities and the Private Placement.

34. As noted above, the Second Lien Notes and the Senior PIK Notes will be cancelled, and holders of such Notes will receive 96.25% and 3.75 %, respectively, of the new common stock in Vertis Holdings, subject in the case of the former to dilution on account of the Private Placement and the Backstop Fee, and, in each case, the management incentive plan described above. The Offering Memorandum and Disclosure Statement contain a reorganization valuation for the reorganized enterprise, the mid-point of which is estimated at $800 million. Based on this estimated value, the estimated recovery to holders of Second Lien Notes, not including any stock they receive on account of the Private Placement, is approximately 22%; their estimated recovery, including the stock they receive on account of the Private Placement, and assuming 100% participation in the Private Placement, is approximately 41.74%.[5] The estimated recovery to holders of Senior PIK Notes is 5.15%.

35. The Debtors seek to consummate the Plan by December 31, 2010. This will allow the Debtors to start their new fiscal year as reorganized entities with a de-leveraged capital structure, thereby enhancing the Debtors' competitive position in the marketplace. As noted above, the first calendar quarter of each year is significant for the Debtors, and they need to be in a position to advise customers, vendors, suppliers and employees that they have formally exited from chapter 11 prior to commencement of the critical first quarter. The importance of

---

[4]  Holders of certain consulting agreement claims will receive 50% of their claims in cash in full satisfaction of their claims.

[5]  As noted above, Avenue is the sole holder of the Series C Second Lien Notes. It has voluntarily reduced the amount of its Series C Second Lien Note claim by 5%. The estimated recovery of 41.74% reflects this voluntary reduction.

doing so is further underscored by the fact that the Debtors have faced significant financial issues for a prolonged period of time that must be definitively resolved now.

36. Indeed, this is the Debtors' second chapter 11 in two years, and since April of this year, the Debtors have attempted, unsuccessfully, to restructure their balance sheets through five different exchange offers. Consummation of the Plan by year's end will allow the Debtors to put these matters behind them. None of the Note holders will be prejudiced by an expedited chapter 11 process -- they are all well aware of the Debtors' restructuring efforts, having received multiple offering memoranda this year on the Debtors' financial condition. Accordingly, the Debtors seek, pursuant to a motion to be filed substantially contemporaneously herewith, a confirmation hearing on the Plan prior to year end.

## VII. First-Day Motions and Orders

37. Concurrently with the filing of their chapter 11 petitions, the Debtors are seeking orders approving the relief sought in the First-Day Motions (collectively, the "First-Day Orders"). The Debtors believe that the First-Day Orders are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. The Debtors respectfully request that each of the First-Day Orders be entered, as they are a critical element in stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases. A list of the First-Day Motions is attached hereto as Exhibit B.

38. In connection with the preparation of these bankruptcy cases, I have reviewed the First-Day Motions and proposed First-Day Orders (including the exhibits thereto). The facts set forth therein are (a) true and correct to the best of my knowledge, information, and belief, based upon the information supplied or verified by various employees of the Debtors, as well as information provided to me by professionals at FTI Consulting, Inc. the financial advisor

for the Debtors, and (b) incorporated herein by reference. I believe that the entry of the proposed First-Day Orders granting the relief requested in the First-Day Motions is critical to the Debtors' ability to preserve the value of their estates.

## VIII. Information Required by Local Rule 1007-2

39. Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain information, which is set forth below.

40. As required by Local Bankruptcy Rule 1007-2(a)(4), Exhibit C lists the following information with respect to each of the holders of the Debtors' twenty (20) largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on Exhibit C are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims and offsets with respect to each claim.

41. As required by Local Bankruptcy Rule 1007-2(a)(5), Exhibit D lists the following information with respect to each of the holders of the five (5) largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number and zip code, if not included in the post office address), the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed. In each case, the claim amounts listed on Exhibit D are estimated and subject to verification. The Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

42. As required by Local Bankruptcy Rule 1007-2(a)(6), Exhibit E provides a summary of the Debtors' assets and liabilities on a consolidated basis.

43. As required by Local Bankruptcy Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, there are no publicly held shares of stock, debentures, or other securities of the Debtors.

44. As required by Local Bankruptcy Rule 1007-2(a)(8), Exhibit F provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor or agent for any such entity.

45. As required by Local Bankruptcy Rule 1007-2(a)(9), Exhibit G provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business.

46. As required by Local Bankruptcy Rule 1007-2(a)(10), Exhibit H provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

47. As required by Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

48. As required by Local Bankruptcy Rule 1007-2(a)(12), Exhibit I provides a list of the names of the individuals who comprise the Debtors' existing senior management, their respective tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

49. As required by Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), <u>Exhibit J</u> provides the estimated amount of weekly payroll to the Debtors' employees on a consolidated basis (not including officers, directors and stockholders) and the estimated amount, on a consolidated basis, to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the thirty (30)-day period following the filing of the Debtors' chapter 11 petitions.

50. As required under Local Bankruptcy Rule 1007-2(b)(3), <u>Exhibit K</u> provides a list of estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees, on a consolidated basis for the thirty (30)-day period following the Petition Date.

## **CONCLUSION**

Accordingly, for the reasons stated herein and in each of the First-Day Motions and First-Day Orders, the Debtors request that the relief sought in the First-Day Motions be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
November 17, 2010

VERTIS HOLDINGS, INC., *et al.*

By: _____
Gerald Sokol, Jr.