SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Mark A. McDermott
Kenneth S. Ziman

Counsel for Debtors and Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |
|---|---|
| In re: | Chapter 11 |
| VERTIS HOLDINGS, INC., *et al.*, | Case No. 10-16170 (ALG) |
| Reorganized Debtors | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REORGANIZED DEBTORS' OMNIBUS OBJECTION TO THE CLAIMS OF QUINCY L. ALLEN (CLAIM NOS. 57, 58, 70 AND 71)

The Reorganized Debtors [1] hereby object (the "Objection"), pursuant to section

502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to proof of claim numbers 57,

58, 70 and 71 (collectively, the "Allen Claims") [2] filed on behalf of Mr. Quincy L. Allen ("Mr.

Allen") on or about January 14, 2011, and seek entry of an order reducing the Allen Claims to a

total of no more than $1.1 million in the aggregate and disallowing proof of claim numbers 58,

70 and 71 (together, the "Duplicate Claims") as duplicative of the liability asserted in proof of

---

[1]    The Reorganized Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number, are Vertis Holdings, Inc. (1556); Vertis, Inc. (8322); ACG Holdings, Inc. (5968); Webcraft, LLC (6725); American Color Graphics, Inc. (3976); and Webcraft Chemicals, LLC (6726).

[2]    Claim Nos. 57 and 70 are asserted against Vertis Holdings, Inc. Claim Nos. 58 and 71 are asserted against Vertis, Inc. All of the Allen Claims assert the same purported liability. The Allen Claims are attached hereto as Exhibit A-1, A-2, A-3 and A-4.

claim number 57. In support of the Objection, the Reorganized Debtors submit the Declaration of Gerald Sokol, Jr. in Support of Reorganized Debtors' Omnibus Objection to the Claims of Quincy L. Allen (Claim Nos. 57, 58, 70 and 71) (the "Sokol Declaration"), a copy of which is attached hereto as Exhibit B, and the Declaration of Joshua Scherer in Support of Reorganized Debtors' Omnibus Objection to the Claims of Quincy L. Allen (Claims Nos. 57, 58, 70 And 71), attached hereto as Exhibit C (the "Scherer Declaration") and respectfully represent as follows:

## Preliminary Statement

1. Mr. Quincy Allen served as the Debtor's Chief Executive Officer and President under the terms of an Employment Agreement (as defined below) until his employment terminated in connection with the filing of the Plan.

2. Despite Bankruptcy Code section 502(b)(7), which clearly caps any damages arising under a rejected employment agreement at one-year compensation without acceleration of any amounts, Mr. Allen now seeks payment of all severance benefits described in the Employment Agreement. The Reorganized Debtors do not dispute that Mr. Allen is entitled to payment of one-year's salary (i.e., $800,000) and one installment of his Sign-On Bonus (i.e., $300,000) under the terms of his Employment Agreement and the Bankruptcy Code section 502(b)(7) cap. However, Mr. Allen is not entitled to payment of certain performance-based bonuses where he has failed to demonstrate – and, in fact, cannot demonstrate – that the requisite performance targets or thresholds for such awards have been satisfied. In particular, Mr. Allen's:

- claim for $3.2 million in base salary and Annual Bonus should be disallowed because:

  - Mr. Allen is entitled to no more than $800,000, which represents one year of

salary for the year following the Petition Date.

   o   Mr. Allen is not entitled to any portion of the Annual Bonus because such bonus required satisfaction of the EBITDA threshold established under the Management Incentive Compensation Plan (as defined below), which was not met.

- Mr. Allen's claim for $900,000 Sign-On Bonus should be disallowed because he is entitled to only one-year's installment of the Sign-On Bonus (i.e., $300,000) under section 502(b)(7) of the Bankruptcy Code.

- Mr. Allen's claim for $1,350,000 on account of the Long-Term Award should be disallowed because:

   o   with respect to the Exit Bonus, Incremental Enterprise Value (which drives the Bonus Pool amount) is ($20.4) million, thereby leaving no Bonus Pool from which Mr. Allen could net an Exit Bonus award; and

   o   with respect to the Performance Bonus, such bonus was likewise a function of Incremental Enterprise Value, thereby leaving no Bonus Pool from which Mr. Allen could net a Performance Bonus award, and Mr. Allen has offered no evidence demonstrating that the applicable performance requirements were met.

## Background

3.   On November 17, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.   On December 16, 2010, the Court confirmed the Amended Joint Prepackaged Chapter 11 Plan of Vertis Holdings, Inc. et al., (the "Plan") pursuant to the Findings of Fact, Conclusions of Law and Order (I) Approving (A) the Disclosure Statement Pursuant to Sections 1125 and 1126(c) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures, and (C) Forms of Ballots, and (II) Confirming the Amended Joint Prepackaged Chapter 11 Plan of Vertis Holdings, Inc. et al. [Docket No. 134] (the "Confirmation Order").

5.   Pursuant to the terms of the Plan and Confirmation Order, certain specified executory contracts and unexpired leases were rejected. Among the contracts rejected pursuant to the Plan and the Confirmation Order were the Employment Agreement dated March

13, 2009, between Vertis Holdings, Inc., Vertis, Inc., and any of their respective successors, and Quincy Allen, and any and all agreements, incentives, or awards entered into in connection therewith (collectively, the "Employment Agreement"). A copy of the Employment Agreement is attached hereto as Exhibit D.

6. On December 17, 2010, the Reorganized Debtors filed with the Bankruptcy Court and served upon Mr. Allen the Notice of Rejection of Certain Executory Contracts and Unexpired Leases of Nonresidential Property and Deadline to Submit Related Proofs of Claim [Docket No. 141].

7. On December 20, 2010, the Plan became effective and the Reorganized Debtors successfully emerged from chapter 11. See Notice of (I) Confirmation of Amended Joint Prepackaged Chapter 11 Plan of Vertis Holdings, Inc. et al. Under Chapter 11 of the Bankruptcy Code, (II) The Occurrence of the Effective Date and (III) Deadline for Filing Applications for Professional Fees [Docket No. 145] (the "Notice of Effective Date").

8. On January 14, 2011, Allen filed the Allen Claims asserting claims against the Debtors arising from rejection of the Employment Agreement.

9. Pursuant to the Plan, "[a]ll Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 7 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan." Plan at § VI.B.

10. Class 7 General Unsecured Claims (as defined in the Plan) were Unimpaired and Reinstated (each as defined in the Plan) pursuant to the Debtors' Plan.

Importantly, however, the Plan likewise provided that "[f]or the avoidance of doubt, any Rejection Damages shall be subject to any applicable statutory damages caps, including but not limited to those caps set forth in Bankruptcy Code section 502(b)." Id. Thus, while the Allen Claims are General Unsecured Claims and accordingly Reinstated under the Plan, the Allen Claims are nonetheless subject to disallowance as a result of contract and the mandatory statutory cap imposed under Bankruptcy Code section 502(b)(7). Id.; 11 U.S.C. § 502(b)(1), (7).

11. Moreover, and as a preliminary matter, although Mr. Allen has filed four (4) proofs of claim asserting the same liability for the termination of the Employment Agreement, Mr. Allen is only entitled to a single satisfaction of the Allen Claims (as reduced as set forth herein). See Plan at § V.S ("Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim."). Accordingly, the Duplicative Claims should be disallowed in their entirety.

### Summary of the Allen Claims

12. Mr. Allen is the former President and Chief Executive Officer of the Debtors. Following the rejection of his Employment Agreement, Mr. Allen ceased working for the Debtors and subsequently filed the Allen Claims, alleging that he is owed compensation resulting from his employment termination and the rejection of his Employment Agreement.

13. Specifically, Mr. Allen alleges that the Reorganized Debtors owe him a

total of $5,750,000 "for damages caused by the Debtor's rejection of the Employment Agreement," which amount is comprised of: (i) $3,200,000 in salary and annual bonus (the "Annual Bonus"); (ii) $1,200,000 on account of a signing bonus (the "Sign-On Bonus"); and (iii) $1,350,000 on account of a long-term, performance-based incentive compensation award (the "Long-Term Award").  Allen Claims at 3, ¶ 7.

14.     Mr. Allen claims that the above compensation is due to him under Sections 5(d)(ii) and 5(d)(v) of the Employment Agreement.  Id.  These provisions address the issue of termination payments to Mr. Allen in the event his employment ends within the one year period following a Change of Control (as such term is defined in the Employment Agreement). As set forth in the Allen Claims, Mr. Allen argues, in the alternative, that compensation (totaling $4,950,000) is due to him under Section 5(c) of the Employment Agreement, which addresses termination payments due to Mr. Allen *other than* in connection with a Change of Control.  Id. at ¶ 7, nn.3-5.  As more fully discussed below with respect to each separate component of the Allen Claims, such claims should be disallowed regardless of whether Mr. Allen relies upon Section 5(c) or Section 5(d) of his Employment Agreement because both sections are premised upon the same conditions for payment.  Therefore, while the Debtors do not concede that the transactions contemplated by the Plan constitute a Change of Control, and in fact expressly reserve all rights with respect to any such claim, this Court need not reach such a determination in light of Mr. Allen's clear lack of entitlement to such damages under the very terms of the Employment Agreement and the Bankruptcy Code section 502(b)(7) cap.

**Objection**

15.     The Debtors file the Objection to effect the disallowance of certain of the Allen Claims – and to reduce the allowed amount of certain of the Allen Claims –  to $1,100,000.

Certain aspects of the Allen Claims are simply unenforceable under the Employment Agreement, (see 11 U.S.C. § 502(b)(1)), and others are limited by operation of Bankruptcy Code section 502(b)(7). That section imposes a "cap" on claims arising from the rejection of an employment agreement, and provides that such claims shall be no greater than the amounts coming due within one year following the commencement of chapter 11 cases. Importantly, this mandatory cap provides that such amounts shall be calculated *without acceleration* and, thus, damages arising from the rejection of the contract must be calculated without regard to provisions that would accelerate amounts due as a result of breach or otherwise.

16.     Mr. Allen retains the ultimate burden of proof with respect to his claims. See In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) ("[t]he burden of persuasion is always on the claimant"); In re Interact Med. Techs. Corp., No. 98-42912-JBR, 2003 Bankr. LEXIS 2276, at *6 (Bankr. D. Mass. Aug. 4, 2003) ("[i]f the trustee succeeds in overcoming the *prima facie* effect given to the claim, the ultimate burden remains on the claimant to prove the validity of the claim by a preponderance of the evidence"); Collier on Bankruptcy P 502.02[f] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[t]he ultimate burden ordinarily remains on the claimant to prove the validity of the claim by a preponderance of the evidence").

17.     Here, Mr. Allen does not have – and accordingly cannot prove – any entitlement beyond $1.1 million in light of the terms of the Employment Agreement and the mandatory Bankruptcy Code section 502(b)(7) cap.

A.     **The Allowed Allen Claims Are Subject To The Mandatory Cap Imposed By Bankruptcy Code Section 502(b)(7)**

18.     Bankruptcy Code section 502(b)(7) caps a terminated employee's damages arising from the termination of his employment contract to the "compensation" provided for

under such contract "without acceleration, for the one year following the earlier of" the filing of the chapter 11 petition(s) or the date of termination of performance, plus the unpaid compensation due under such contract on the applicable foregoing date. 11 U.S.C. § 502(b)(7); see In re Ajay Sports, Inc., 370 B.R. 703, 713 (Bankr. E.D. Mich. 2007) ("The thrust of [Bankruptcy Code] section 502(b)(7) is to limit claims arising out of the rejection of an executory contract."). Bankruptcy Code section 502(b)(7) applies to any employee's claim based on termination of his employment agreement, regardless of how long before bankruptcy the termination occurred, whether the termination occurred pre- or post-petition or whether the claim was reduced to a judgment. For example, as the court made clear in Anthony v. Interform Corp., 96 F.3d 692, 697 (3d Cir. 1996), "the express terms of [section] 502(b)(7) of the Bankruptcy Code mandate . . . [placing] a cap upon *all* employment contract termination claims, regardless of whether: (1) the claim has been reduced to judgment; (2) there is any connection between the employee's termination and the debtor's financial problems; and (3) a number of years has passed between the employee's termination and the debtor's filing of the bankruptcy petition."

19.     Specifically, the terminated employee can only recover (i) up to one year of future compensation under his employment contract, without acceleration, from the date of the debtor's chapter 11 petition or the date of termination, whichever is earlier, and (ii) any unpaid compensation due to the employee prior to termination. 11 U.S.C. § 502(b)(7); In re Prospect Hill Resources, Inc., 837 F.2d 453, 455 (11th Cir. 1988) ("One purpose of section 502(b)(7) was to relieve bankrupt employers of the continuing duty to pay high salaries to officers and owner-managers who had been able to extract favorable terms of tenure and salaries while the business prospered."). Stated otherwise, Bankruptcy Code section 502(b)(7) allows claims for earned compensation to be paid in full and caps claims resulting from termination of employment to one

year's compensation under the employment agreement.  In re Dornier Aviation (N. Am.), Inc., 305 B.R. 650, 654 (E.D. Va. 2004) (Bankruptcy Code section 502(b)(7) draws a sharp line between (i) claims for compensation already earned as of the termination date, and (ii) claims for amounts that are accelerated or become due as a result of the termination); see In re Interact Med. Techs., 2003 Bankr. LEXIS 2276, at *7-9 (allowing the employee's claim of pre-termination salary in full but capping his severance pay).

20.     The Allen Claims seek damages resulting from the rejection of the Employment Agreement – which, by Mr. Allen's own filings, include salary, bonuses, long-term incentives and the like – such amounts are "compensation" under Bankruptcy Code section 502(b)(7).[3]  See Allen Claims at 3, ¶ 7.  Accordingly, the Allen Claims are claims for compensation arising from the rejection and termination of the Employment Agreement, and therefore must be capped under Bankruptcy Code section 502(b)(7).  11 U.S.C. § 502(b)(7); In re Malden Mills Indus., Inc., 302 B.R. 408, 411-12 (Bankr. D. Mass. 2003).

## B.     Application Of The Mandatory 502(b)(7) Cap To The Allen Claims Results In Disallowance Of All But $1.1 Million of The Allen Claims

21.     As discussed below, the Reorganized Debtors dispute the allowance of a claim for any Annual Bonus and any Long-Term Award as a matter of contract and state law.  In addition, Mr. Allen's claims for salary and Sign-On Bonus should be reduced because the Bankruptcy Code section 502(b)(7) capped amount is less than the total amount of contractual damages otherwise payable.  See, e.g., In re Dornier Aviation (N. Am.), Inc., 305 B.R. at 654 n.11; In re Condor Sys., Inc., 296 B.R. 5, 12-13 (B.A.P. 9th Cir. 2003); In re Murray Indus., Inc.,

---

[3]     Indeed, each of the foregoing are set forth in section three of the Employment Agreement entitled "Compensation and Benefits".  Employment Agreement at § 3(c).

138 B.R. 999, 1003 (Bankr. M.D. Fla. 1992).

(a)    **Salary**

22.    The Reorganized Debtors do not dispute that Mr. Allen is entitled to an allowed claim of $800,000, representing one year of salary for the year following the Petition Date, without acceleration, as such amount falls squarely within the "cap" imposed by Bankruptcy Code section 502(b)(7).  See 11 U.S.C. § 502(b)(7)(A)(i) (limiting the statutory cap to one year's compensation from the date of the petition or termination).  Indeed, because Bankruptcy Code section 502(b)(7) mandates that damages arising from rejection of an employment agreement be measured as though there were no breach of the underlying employment agreement, Mr. Allen is not entitled to seek payment of the full salary amounts set forth in Section 5(d)(ii) of his Employment Agreement, which deals specifically with payments due in the event of his employment termination.  See In re CPT Corp., No. BKY 4-90-5759, 1991 Bankr. LEXIS 1730, at *11 (Bankr. D. Minn. Nov. 27, 1991) ("Section 502(b)(7) limits a claim for future compensation which conceivably would have been earned *had the parties continued to perform* under the terminated contract.") (emphasis added); see also In re Dornier Aviation (N. Am.), Inc., 305 B.R. at 654 ("§502(b)(7)'s one year cap clearly limits an employee's claim for severance pay, as this is in effect a claim for prospective compensation that is accelerated as a result of the termination").  Thus, similar to the claimant in Protarga, Inc. v. Webb (In re Protarga, Inc.), 329 B.R. 451, 465 (Bankr. D. Del. 2005), Mr. Allen disregards the clear instruction of Bankruptcy Code section 502(b)(7) to eliminate any consideration of payments due on account of termination.  Id. (limiting the terminated executive's compensation to one-year compensation following termination without cause and noting that claimant "fails to make the distinction contained in §502(b)(7) between 'damages resulting from the termination'

and the 'compensation' provided for the one year period."); see Employment Agreement at 7, ¶ 5(d)(ii).  Thus, $800,000 of Mr. Allen's "Base Salary" claim should be allowed and the remaining $2.4 million of his "Base Salary and Annual Bonus" claim should be disallowed.

### (b)    Sign-On Bonus

23.    The Sign-On Bonus provided for under the Employment Agreement also constitutes "compensation" and is therefore subject to the cap imposed by Bankruptcy Code section 502(b)(7).  11 U.S.C. § 502(b)(7)(A); Halper v. Halper, 164 F.3d 830, 839 (3d Cir. 1999); In re Malden Mills, 302 B.R. at 411-12.  As noted above, the Allen Claims seek "$1,200,000 for the Sign-On Bonus amounts payable under Section 5(d)(ii) of the Employment Agreement," which pertains to certain termination payments in connection with a Change in Control (as such term is defined in the Employment Agreement).  Allen Claims at 3, ¶ 7.  However, the Employment Agreement sets forth a schedule for payment of the Sign-On Bonus.  Employment Agreement at 3, ¶ 3(c).  Pursuant to this schedule, one quarter of the Sign-On Bonus (i.e., $500,000) was paid within fifteen (15) days after the Effective Date (as such term is defined in the Employment Agreement) (i.e., April 6, 2009), and that the remaining $1.5 million was to be paid in *annual* installments of $300,000 each, payable on each of the first five (5) anniversaries of the Effective Date.  Id.

24.    In light of this schedule, one such $300,000 payment was made in April 2010 and only one such $300,000 payment would be due within the one year following the Petition Date.  Consistent with Mr. Allen's claim for salary discussed above, because Bankruptcy Code section 502(b)(7) requires that damages arising from rejection of an employment agreement be measured as though there were no breach of the underlying employment agreement and *without acceleration*, Mr. Allen is not entitled to seek payment of the full, accelerated

amount of the Sign-On Bonus. 11 U.S.C. § 502(b)(7); see In re Protarga, Inc., 329 B.R. at 465; In re CPT Corp., 1991 Bankr. LEXIS 1730, at *11-12; see also In re Dornier Aviation (N. Am.), Inc., 305 B.R. at 654.

25.     Accordingly, Mr. Allen is entitled to only one-year's installment of his Sign-On Bonus in the amount of $300,000 under Bankruptcy Code section 502(b)(7), and the balance of the Allen Claims relating to the Sign-On Bonus should be disallowed.[4]

## C.     The Annual Bonus and Long-Term Award Should Be Disallowed In Full

### (a)     Annual Bonus

26.     Mr. Allen is not entitled to any portion of the Annual Bonus because he did not satisfy the required performance metrics to trigger the Company's obligation under his contract. See Employment Agreement at 3, § 3(b)(ii) (stating the Board shall establish performance goals, in consultation with Mr. Allen, for "a level of performance at which the threshold Annual Bonus shall be earned and below which no Annual Bonus shall be earned ...."). In particular, the Employment Agreement provides that the Annual Bonus is "dependent on the attainment of one or more objectives of Vertis . . . relating to synergies; EBITDA; debt repayment; maintenance of financial ratios; and/or cash flow." Id.

27.     Mr. Allen contends that he is entitled to payment of an Annual Bonus under Section 5(d)(ii) of the Employment Agreement. However, Mr. Allen does not even identify the year to which such bonus relates, let alone demonstrate or assert that he met the

---

[4]     Mr. Allen argues, in the alternative, that he is entitled to the full Sign-On Bonus under Section 5(c)(v) of the Employment Agreement. As noted above, this section pertains to termination payments *other* than in connection with a Change in Control (as such term is defined therein). However, he is not entitled to full acceleration of the Sign-On Bonus under Bankruptcy Code 502(b)(7) because, under Section 3(c) of the Employment Agreement, only one installment of the Sign-On Bonus was due within the one year period following the Petition Date. See Employment Agreement, at 7, ¶ 5(c)(v).

performance goals which would entitle him to receipt of an Annual Bonus award for 2010 or 2011. Allen Claims at 3, ¶ 7. In fact, Mr. Allen cannot demonstrate that he met such performance conditions for 2010. As the Sokol Declaration makes clear, no Annual Bonus amount came due under the Employment Agreement for 2010, and indeed none would have come due under the Employment Agreement during the one year period following the Petition Date (ending on November 16, 2011). See Sokol Declaration at ¶¶ 6, 7. More specifically, the Company adopted a Management Incentive Compensation Plan for FY 2010 ("MICP"). A copy of the MICP is attached hereto as Exhibit E; see Sokol Declaration at ¶ 6. The bonus payment threshold for the MICP was $166.1 million of Adjusted EBITDA. See Sokol Declaration at ¶ 6. This $166.1 million threshold was the performance target with respect to Mr. Allen's eligibility for an Annual Bonus award for fiscal year 2010. See id. As the Adjusted EBITDA for the 2010 fiscal year of the Debtors was $151.217 million, the threshold set by the MICP was clearly not satisfied for such year. Id. Accordingly, no participant in the MICP received a bonus for 2010 and Mr. Allen was not due an Annual Bonus award under his Employment Agreement. Id.

28.     Even absent the specific evidence set forth above regarding the bonus payment EBITDA threshold for fiscal year 2010, this Court should disallow Mr. Allen's claim for an Annual Bonus in its entirety. Indeed, courts have disallowed claims by terminated executives on account of performance-based bonuses where the executive provided no proof of meeting the required performance levels, and where the company's bankruptcy filing(s) indicated that such levels would not likely have been achieved. For example, in In re Protarga, Inc., 329 B.R. at 457, an executive claimed he was entitled to a severance package under his employment agreement equal to 300% of the sum of his then current base salary and his then-applicable bonus opportunity. In determining that the executive was not entitled to a performance bonus,

the court noted that the "[the company's] bankruptcy status certainly supports the conclusion that no bonuses were going to be paid [in the year following the employee's termination]." Id. at 467. Moreover, in In re Interact Med. Techs., 2003 Bankr. LEXIS 2276, an employee alleged as part of his claim that he was due a bonus under his employment contract. Such contract provided in part that he would "receive forty percent (40%) of his current salary upon satisfaction by the Company of certain performance goals, which goals shall be established by mutual agreement between the Employee and the Board of Directors of the Company." Id. at *10. In denying the $76,000 bonus claim, the Interact court stated:

> There is no evidence in the record of whether these "certain performance goals" were ever established or if Claypool ever reached them. Therefore, Claypool has failed to allege facts sufficient to support a legal basis for the claim and the $76,000 will not be included in the allowed portion of Claypool's claim.

Id. at *10-11.

29.    Here, Debtors' bankruptcy status, as evidenced in its chapter 11 filings in this Court on the Petition Date, certainly supports the conclusion that no Annual Bonus amount was due to Mr. Allen for fiscal year 2010. See In re Protarga, Inc., 329 B.R. at 467. In light of such circumstances and the lack of any showing by Mr. Allen regarding satisfaction of the performance metrics applicable to his Annual Bonus opportunity, this Court should disallow his claim for any such award. See id.; In re Interact Med. Techs., 2003 Bankr. LEXIS 2276, at *10-11. Indeed, Mr, Allen retains the ultimate burden with respect to this claim, and the facts demonstrate that this burden simply cannot be satisfied. See id. at *5; In re Allegheny Int'l, Inc.,

954 F.2d at 173-74.[5]

30.    To the extent that Mr. Allen seeks an Annual Bonus with respect to fiscal year 2011, such claim should be disallowed given the lack of evidence demonstrating that Mr. Allen earned a bonus for 2011. See In re Protarga, Inc., 329 B.R. at 467; In re Interact Med. Techs., 2003 Bankr. LEXIS 2276, at *10-11. In addition, any bonus which Mr. Allen might have earned for that fiscal year would not be payable under the Employment Agreement until on or after January 1, 2012. Employment Agreement at 3, § 3(b)(ii) ("[a]ny annual bonus shall be paid to the Executive in a lump sum as soon as reasonably practicable, but in no event later than March 15, following the end of the applicable fiscal year"). Accordingly, any claim for a 2011 Annual Bonus must be disallowed by operation of law because any bonus payment with respect to such year would fall outside the one-year period following the Petition Date (ending on November 16, 2011). See 11 U.S.C. § 502(b)(1), (7).

### (b)    Long-Term Award

31.    Finally, Mr. Allen is not entitled to any payment on account of the Long-Term Award. The Long-Term Award is based upon certain executive incentive compensation programs established by the Debtors pre-petition, which programs provided a source of cash-based awards pursuant to which the Debtors could grant certain executives additional annual performance-based bonuses at levels that were based upon company-wide performance goals, specific target objectives and individual participant objectives. Specifically, and as set forth in that Vertis Long-Term Cash Incentive Plan Award Agreement (the "Award Agreement"),

---

[5]    Mr. Allen's reliance on Section 5(c)(ii) of the Employment Agreement, which pertains to termination payments other than in connection with a Change in Control, as an alternative basis for claiming an entitlement to $3,200,000 in Base Salary and Annual Bonus, does not change this outcome given that Sections 5(c)(ii) and 5(d)(ii) utilize the same Annual Bonus threshold. See Employment Agreement, at 6-7, ¶ 5(c)(ii), 5(d)(ii).

attached to the Employment Agreement as Exhibit A, the Long-Term Award is comprised of two

elements: an Exit Bonus and a Performance Bonus (as such terms are defined below). See

Award Agreement at ¶¶ 2, 3, attached as Exhibit A to the Employment Agreement. As set forth

below, no Exit Bonus or Performance Bonus amounts were earned or otherwise vested under the

Employment Agreement, and given the resulting enterprise value of the Reorganized Debtors,

none would have come due under the Employment Agreement. See Scherer Declaration at ¶¶ 12,

13; see, e.g., In re Interact Med. Techs., 2003 Bankr. LEXIS 2276, at *10-11.

### (i)     The Exit Bonus

32.      Absent the termination of Mr. Allen's employment with the Debtors, the

Award Agreement provided for an exit bonus (the "Exit Bonus") consisting of "a cash payment

equal to a maximum amount of twenty percent (20%) of the Bonus Pool, measured as of the date

of consummation of the Change of Control[6] . . . which gives rise to [Mr. Allen's] entitlement to

receive such cash payment." Award Agreement at ¶ 2(a).

33.      Under the Award Agreement, Bonus Pool is defined as "13.25% of the

Incremental Enterprise Value ….." `, ¶ 2(d). The Award Agreement defines the "Incremental

Enterprise Value" as:

> the total consideration paid in respect of (i) the Employers'
> outstanding debt (i.e., bank debt and bonds) (which, in the case of
> debt that is rolled-over in such transaction, shall include the fair
> market value of the debt assumed or rolled-over in such transaction,
> as determined by an independent financial expert chosen by the
> Employers (whose determination will be final and binding)) and (ii)
> equity securities (it being understood that if the consideration paid
> is in the form of securities (including in the case of any roll-over of

---

[6]     Capitalized terms not defined in the Award Agreement have the meanings ascribed to such terms in the Vertis
Long-Term Cash Incentive Plan (the "LTIP").

securities) the amount attributed thereto for the purpose of determining Incremental Enterprise Value shall be the fair market value of such securities as determined by an independent financial expert chosen by the Employers (whose determination will be final and binding)), less $750,000,000 (as may be adjusted by the Board, as appropriate, to reflect acquisitions made by the Employers).

Id., 2(j).

34.     Thus, in determining the Bonus Pool, the critical input is the amount, if any, of the "Incremental Enterprise Value."  Pursuant to the definition of Incremental Enterprise Value, for an award participant such as Mr. Allen to receive a payment under the Bonus Pool, the total consideration paid in connection with a transaction must exceed $750,000,000.  LTIP at § 2(j).  As set forth in detail in the Scherer Declaration, the consideration paid in respect of the Reorganized Debtors' outstanding debt and equity securities in connection with the transactions contemplated by the Plan had an implied value of only $729.6 million.  See Scherer Declaration at ¶¶ 10, 11, 12.  Therefore, the "Incremental Enterprise Value" under the Award Agreement is negative $20.4 million (i.e., $729.6 million "less $750,000,000") and, as a result, the Bonus Pool must be zero.  LTIP at §§ 2(d), (j).  See also Scherer Declaration at ¶ 13.

35.     Consequently, there exists no Bonus Pool from which to pay any Exit Bonus and that portion of the Allen Claims relating to the Exit Bonus must be disallowed.  Such claims should be disallowed regardless of whether Mr. Allen pursues his claim for an Exit Bonus under Section 5(d)(v) of the Employment Agreement, which pertains to termination payments in connection with a Change of Control, or under Section 5(c)(vi) of such agreement pertaining to payments other than in connection with a Change in Control.  Both sections provide for treatment of the Long-Term Award in accordance with the terms of the LTIP and thus rely upon the very same Bonus Pool formula which, in this case, nets no payment to Mr. Allen.  See Allen

Claims at 3, ¶ 7, n.5; Employment Agreement at 7, ¶¶ 5(c)(vii), 5(d)(v).

### (ii)  The Performance Bonus

36.     Likewise, that portion of the Allen Claims relating to a Performance Bonus (as defined below) must be disallowed because there is simply no Bonus Pool from which to pay Mr. Allen any such bonus.  In that regard, absent Mr. Allen's termination of employment, the Award Agreement provided Mr. Allen with the opportunity to earn a performance-based bonus (the "Performance Bonus") in the event of a "Change of Control," which Performance Bonus constituted a cash payment "equal to a maximum amount of twenty percent (20%) of the Bonus Pool, measured as of the date of consummation of the Change of Control," and only if certain performance targets were met by the Debtors.  See Award Agreement at ¶ 3(a), (b). Under the terms of the Award Agreement, "one-fifth (1/5) of the total amount of the Performance Bonus will be earned, and eligible to vest, based on the achievement of the EBITDA and/or debt repayment targets (collectively, the "Performance Targets") for each of the 2009, 2010, 2011, 2012 and 2013 fiscal years" of the Debtors.  Id. at ¶ 3(b)(i).

37.     As discussed above in connection with Mr. Allen's claim for an Exit Bonus, his entitlement to such bonus consisted of a certain maximum percentage of the Bonus Pool, a critical component of which was the amount, if any, of the "Incremental Enterprise Value."  See Award Agreement at ¶ 2(a).  Pursuant to Section 3(a) of the Award Agreement, Mr. Allen's entitlement to a Performance Bonus is similarly a direct function of the Incremental Enterprise Value.  Id. at ¶ 3(a).  As clearly established by the Scherer Declaration, with respect to the transactions contemplated by the Plan, the "Incremental Enterprise Value" under the Award Agreement is negative $20.4 million (i.e., $729.6 million "less $750,000,000"), thereby resulting in a Bonus Pool of zero.  Indeed, absent any Bonus Pool from which to draw a bonus payment,

18

Mr. Allen has no basis to claim such an award.

38.     Moreover, even if the Bonus Pool could net any award to Mr. Allen, Mr. Allen's claim for any such bonus must be disallowed because he has set forth no evidence demonstrating satisfaction of any performance requirements associated with the Performance Bonus which would trigger his entitlement to such payment.  <u>See</u> <u>In re Interact Med. Techs.</u>, 2003 Bankr. LEXIS 2276, at *10-11 (denying employee's claim for bonus pay based on performance goals where there was no evidence of the employee meeting those performance goals); <u>In re Protarga</u>, 329 B.R. at 466-67 (denying employee's performance-based bonus as part of the cap where employee provided no proof of satisfactory performance and the company's bankruptcy status supported conclusion that no bonuses would be paid).

39.     Indeed, pursuant to the Award Agreement, the only circumstance under which an "unearned" Performance Bonus can vest is upon a Qualifying Exit Event.  <u>See</u> Award Agreement, ¶ 3(c)(ii) ("[s]ubject to Section 3(d) hereof, any unearned portion of the Performance Bonus that has not previously vested or been canceled will become 100% vested on the date of a Qualifying Exit Event.").  A "Qualifying Exit Event" is defined as a Change of Control that occurs on or prior to the fifth anniversary of the grant date of a Bonus, but only if Incremental Enterprise Value equals or exceeds $375M on the date of such Change of Control.  LTIP, ¶2(n). As demonstrated by the Scherer Declaration, based on the Incremental Enterprise Value of the Reorganized Debtors in connection with the Plan, there has been no Qualifying Exit Event and, therefore, any unearned portion of the Performance Bonus could not vest under the plain language of the Award Agreement.  <u>See</u> Scherer Declaration, ¶¶ 12, 13.  Moreover, pursuant to Section 3(d) of the Award Agreement, any unearned portion of the Performance Bonus was canceled as of the consummation of the transactions contemplated by the Plan and the rejection

of Mr. Allen's employment.  See Award Agreement, ¶ 3(d).[7]

## D.      The Duplicative Claims Should be Disallowed In Their Entirety

40.      A review of the Allen Claims indicates that Mr. Allen is asserting multiple or duplicate claims on account of the same liability (i.e., damages arising from the rejection of the Employment Agreement).  Specifically, and as noted above, Mr. Allen has filed proof of claim numbers 57 and 70 against Vertis Holdings, Inc. and proof of claim numbers 58 and 71 against Vertis, Inc.  At the outset, it is axiomatic that a claimant is not entitled to multiple recoveries for a single liability against a single Debtor.  Moreover, the Plan makes explicit that, while claimants may assert claims against multiple debtors, claimants are not entitled to multiple recoveries against the Debtors.  See Plan at § V.S ("Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.").  Moreover, courts have recognized that claimants asserting statutorily capped claims cannot recover from multiple debtors more than the aggregate capped amount of such claims.  See In re Lee Bros. Value World, Inc., 486 F.2d 1037, 1037-38 (9th Cir. 1973) (holding that in applying Bankruptcy

---

[7]      To the extent Mr. Allen argues in the alternative that he is entitled to a Performance Bonus based on Section 5(c)(vi) of the Employment Agreement (which pertains to termination payments other than in connection with a Change of Control) rather than Section 5(d)(v), such claim is of no avail given that both provisions provide for treatment of the Long-Term Award in accordance with the terms of the LTIP and thus rely upon the very same Bonus Pool formula which, in this case, nets no payment to Mr. Allen.  Additionally, both provisions condition payment of the Performance Bonus on satisfaction of the "Performance Targets," which Mr. Allen has not demonstrated have been satisfied.  See Allen Claims at 3, ¶ 7, n.5; Employment Agreement ¶¶, 5(c)(vii), 5(d)(v).

Code section 502(b)(6)'s predecessor to landlord's two separate claims against a debtor-tenant for breach of a lease and a debtor-guarantor for breach of the guaranty of the lease (the tenant and guarantor having merged prior to bankruptcy), "even should the appellants have two claims" against the debtor, such claims are limited in "their allowability to *an aggregate amount* not exceeding" the statutorily defined cap) (emphasis added); In re Revco D.S., Inc., 138 B.R. 528, 532 (Bankr. D. Ohio 1991) (agreeing with case precedent that "[e]ven though [Bankruptcy Code section] 502(b)(6) by its literal language does not expressly limit claims of a landlord against a lease guarantor, case law clearly indicates that [it] is equally applicable in a guarantor's bankruptcy case" as it is in a tenant's bankruptcy case (citing In re Thompson, 116 B.R. 610, 613 (Bankr. S.D. Ohio 1990))). Accordingly, because the Allen Claims assert the same liability against both Vertis Holdings, Inc. and Vertis, Inc. and Allen cannot recover more than 100% of his statutorily capped claim, the Duplicative Claims must be disallowed in their entirety.

## **Reservation of Rights**

41.     The Reorganized Debtors expressly reserve the right to amend, modify or supplement the Objection, and to file additional objections to any claims filed in these chapter 11 cases including, without limitation, omnibus and substantive objections with respect to the Allen Claims. Should this Objection be dismissed or overruled, the Reorganized Debtors also reserve the right to object to any of the Allen Claims on any other grounds that governing law permits. To the extent that the Court finds that the "cap" on the Allen Claims exceeds $1.1 million, the Reorganized Debtors expressly reserve all rights to contest the amounts and validity of the claims asserted in the Allen Claims under any and all legal and equitable grounds, and to contest the allowance of such claims under state law.

## **Conclusion**

42.     For the foregoing reasons, the Reorganized Debtors respectfully request

that the Allen Claims be reduced to no more than $1.1 million, and the Court grant such other

relief that is just and proper under the circumstances.


Dated: New York, New York
     July 8, 2011

                SKADDEN, ARPS, SLATE, MEAGHER
                 & FLOM LLP

           By:     */s/ Kenneth S. Ziman*
                 Mark A. McDermott
                 Kenneth S. Ziman
                 Four Times Square
                 New York, New York 10036
                 (212) 735-3000

                 Counsel for the Debtors and
                  Reorganized Debtors

659604.01-Wilmington Server 1A - MSW